**STATE, EX SQUIRE, Plaintiff-Appellee, v CLEVELAND (CITY) ET., Defendant-Appellant.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 20284.   Decided February 1, 1947.

HILDEBRANT, PJ, MATTHEWS and ROSS, JJ, of the First Judicial District, sitting by designation in the Eighth Judicial District.

Hugh S. Jenkins, Attorney General, Columbus, and R.

Brooke Alloway, Asst. Attorney General, Columbus, Harold O. Ziegler, Cleveland, Boyd, Brooks & Wickham and Ben B. Wickham, Cleveland, for Union Properties, Inc., plaintiff-appellee.

Lee C. Howley, Law Director, Cleveland, Joseph H. Crowley, Robert M. Morgan and James M. McSweeney, Cleveland, for City of Cleveland, defendant-appellant.

Squire, Sanders & Dempsey, R. R. Pierce, Cleveland, for Amici Curiae.

Arthur H. Fiebach and Arthur E. Griffith, Cleveland, for Lake Erie Salt Company, defendant-appellee.

## OPINION

By ROSS, J.

This is an appeal upon questions of law from a declaratory judgment of the Court of Common Pleas of Cuyahoga County.

The only appellant from such judgment is the City of Cleveland.

The proceeding was instituted originally by the State of Ohio, ex rel. Squire, Liquidator of the Union Trust Company of Cleveland, Ohio. The Trust Company held a mortgage upon certain real estate of the Wilson Realty Company, a littoral property owner upon Lake Erie. This mortgage was foreclosed and the property of the Wilson Realty Company was purchased by the Union Properties, Inc., which organization was substituted, by agreement, as plaintiff in this proceeding.

The Lake Erie Salt Company participated in and during the trial of this case was known as Union Salt Company. On May 31, 1944, The Lake Erie Salt Company sold its property to the defendant appellee Union Salt Company, and was given the right to use the name of The Lake Erie Salt Company, which latter organization retained the right to prosecute its original cause of action and recover such damages as should

be awarded for any loss it suffered. This presents a rather confusing situation, in that there are two corporations styled The Lake Erie Salt Company, the first the original littoral owner, which is prosecuting its right of action as a cross-petitioner; the second, its grantee, which changed its name from Union Salt Company (so styled at time of purchase from the original The Lake Erie Salt Company) to The Lake Erie Salt Company. There is, however, only one Lake Shore property involved in which these two corporations have by contract with other other certain rights not important to the issues presented.

The claims of this defendant-appellee are essentially the same as that of the Union Properties, Inc., except that in addition thereto the rights to have free access to the lake for the purpose of draining water therefrom and discharging water therein, made necessary by the character of its business, is involved.

The controversy arises by reason of the construction of a highway and a curved roadway connecting East 55th Street with such highway.

The area involved is that extending along the shore line of the City of Cleveland from East 9th Street to East 70th Street. The highway and roadway connect with other highways at the eastern and western ends, and furnish arteries over which traffic to and from the congested area of Cleveland to the east may pass. The highway, which is officially styled "The Cleveland Memorial Shoreway" is designated in the briefs as the "Shoreway" and will be so referred to hereafter herein.

The Shoreway and curved roadway are built entirely upon filled-in ground, extending outwardly into the lake from the original natural shore line as defined by surveys in the year 1914. It is stated in the appellant's brief that: "It was admitted by all parties that the title to the land and water area of Lake Erie, whether submerged or artificially filled outward from the last natural shore line of the lake is in the State in trust **for the people of Ohio**." (Emphasis added)

The "fills" in the area involved were made by various persons and corporations and at various times, under regulation of the Federal Government.

The appellees are littoral owners of so-called "upland property" the shore line of. which, by reason of such fills, has been extended out into the lake and over which the Shoreway and curved roadway are constructed.

The Federal Government has created two artificial harbors by the erection of breakwaters extending some five miles along

the area in question. The expense incident to the construction of such harbors amounted to some $6,000,000.00, and large sums have been expended since in furthering the use of such harbors.

Sometime during the 1890's, the City of Cleveland built an overhead bridge across rights of way of the railroads at West 3rd Street and started making a fill along the upland frontage between West 3rd and East 9th Streets, which eventually developed into the filled land deeded by the State of Ohio to the City of Cleveland in 1914. (The validity of such transfer is not involved in this appeal.) Upon this filled land the Cleveland Stadium is now located and the docks leased to the D. & C. Navigation Company. This fill also included an extension of East 9th Street and the construction by the City of what is now called the East 9th Street Pier.

The Shoreway consists of a four-lane highway or boulevard. As now regulated by traffic provisions of the City of Cleveland, it is almost entirely devoted to use of passenger vehicles. Traffic markers request the operators of trucks to leave the boulevard at the next intersection. The extent of the traffic allowed and the speed at which such traffic is permitted to operate make it practically impossible for heavy trucks to even cross the highways. No provision has been made for effective crossing of the highways by littoral owners, seeking access to navigable water, or seeking the use of lake water in their industries. There is evidence that some littoral owners, other than the parties hereto, are not at present affected by the use of the highways, owing to the fact that no present necessity for access to navigable water of the lake or the construction of wharfs appear. (1) Not only the instant use of the fills on the lakeside of littoral property is involved. The potential use of such property and fills must be considered also.

The principal questions are developed in the two causes of action stated in the pleadings.

## ISSUES.

In the first cause of action, the Court is asked to determine whether plaintiff has the right to the exclusive use of said made lands for the purpose of a wharf in aid of navigation and commerce; whether plaintiff may fill into the waters of Lake Erie for the purpose of reaching to navigable waters, "but subject to regulation by the Federal Government and to lawful and reasonable regulation by other public authority"; whether or not plaintiff has the right to have uninterrupted and unimpeded access from its upland to the navigable waters of the Lake; to determine plaintiff's easterly and westerly

boundaries in said made land, and to determine whether §§3699-1 to 3699-10 GC are invalid and unconstitutional in the respects above set forth; to determine whether or not these sections authorize the City to construct any work contemplated therein upon such made lands without compensating plaintiff for the consequent interference with, or impairment or destruction of its littoral rights, including the right of free and uninterrupted access to the navigable waters of the lake, and further, to determine whether the City may construct such work without first compensating the owner for such impairment or destruction of his littoral rights.

In the second cause of action, the Court is asked to enjoin the City of Cleveland from maintaining the Shoreway and curved highway and the sewer constructed thereunder, and require the removal thereof, or to prohibit the indiscriminate use thereof by the public. The Salt Company also seeks protection of its rights to take water from the lake for use in its industry.

The issues as presented by the pleadings are well stated in the opinion of Corlett, J:—

## PLEADINGS.

"The original petition was filed in October, 1937, by the Superintendent of Banks of the State of Ohio in charge of liquidation of The Union Trust Company, Cleveland, Ohio, plaintiff, against the City of Cleveland, the Works Progress Administration and the Wilson Realty Company. In this petition the plaintiff alleged that he was vested with the title to all assets of The Union Trust Company which was being liquidated under the laws of the State of Ohio; that the Wilson Realty Company, a corporation, owned certain property described in his petition and which property is located on the southeasterly corner of East 55th Street and Lake Erie in the City of Cleveland; that the Wilson Realty Company had executed a mortgage and note in the sum of $275,000 to The Union Trust Company in November, 1928; that the Wilson Realty Company was insolvent; that a decree in foreclosure had been taken against said company, and that the petition was filed to protect the interests of the liquidator of The Union Trust Company. This petition alleged that the City of Cleveland in cooperation with the Works Progress Administration was about to build a roadway along the shore of the Lake in front of the property owned by the Wilson Realty Company, and that the building of the road would deprive the plaintiff of its rights to wharf out to navigable waters of Lake Erie resulting in a

depreciation of their property, and the petition contained a prayer for a temporary injunction restraining the City of Cleveland and the Works Progress Administration from proceeding with the construction of the roadway. No injunction has ever been granted.

"After this petition was filed Union Properties, Inc., acquired title to the property through foreclosure proceedings and was substituted as plaintiff and by permission of the Court filed what is designated as a second amended and supplemental petition. This pleading was filed in April, 1943. The second amended petition avers the corporate capacity of the plaintiff, Union Properties, Inc., and of The Union Salt Company, and that the City of Cleveland, the other defendant, is a municipal corporation. It alleges that the Wilson Realty Company acquired the property as bounded and described in the amended petition, on the 14th day of August, 1905; that in 1928 the Wilson Realty Company mortgaged the property to the Union Trust Company for the sum of $275,000; that the note secured by said mortgage became due and was not paid; that subsequently the Superintendent of Banks in the foreclosure proceedings secured a judgment on the note for $389,983.54; that subsequently the note, mortgage and judgment were assigned to the new plaintiff Union Properties, Inc. It is averred that on October 26, 1937, the amount due on the judgment was $417,883, and that when the property was sold by the sheriff of this County to Union Properties, Inc., there was a deficiency judgment of $196,000. The plaintiff then alleges that on or about the year 1914 its predecessor in title, the Wilson Realty Company, in order to protect and preserve its littoral rights in the property fronting on Lake Erie commenced to fill into the non-navigable waters of the Lake out from the shore line as it existed in 1914; that up to the time of the filing of the petition this filling extended into the Lake seven hundred feet at the westerly end of its property and a distance of about two hundred feet into the Lake at the easterly end of its property. It is alleged that the United States Government in 1927 established a bulkhead line and regulations in reference to filling in from the natural shore line out to the said bulkhead line. The plaintiff alleges that this property is bounded on the west by East 55th Street which extends in a northerly and southerly direction, its northerly end being the shore line of Lake Erie. The plaintiff alleges that the City of Cleveland created an artificial fill at the end of East 55th Street by the dumping of waste material. The plaintiff then alleges that the City of Cleveland and plaintiff are not in agreement as to boundary

lines of its land, as said boundary lines extend out from the natural shore line. It alleges that since the original petition was filed in this case the Court of Appeals of this County in a case then pending entitled Lake Front-East 55th Street Corporation, Plaintiff-Appellee, v The City of Cleveland, Defendant-Appellant, numbered on the docket of said court as No. 17549, determined in that case that the westerly line of East 55th Street extending out beyond the natural shore line of Lake Erie was a line extending northerly from the natural shore line as it existed in 1925 and at right angles to the break wall. The petition then alleges that in 1909 the United States Circuit Court in a case then pending therein entitled The American Steel & Wire Company of New Jersey v The Cleveland Electric Illuminating Company, et al., numbered on the docket of said court as cause No. 7604, determined and established the easterly boundary of The Union Salt Company as a line extending out from the natural shore line at right angles to the break wall as established by the United States government.

"The petition further avers that the City of Cleveland has asserted prior to the institution of this case that the plaintiff has no rights whatsoever in the made or filled in land. The City of Cleveland, the plaintiff alleges, relies upon §§3699a to 3699-10, GC, which sections are known as the Fleming and Abele Acts.

"Union Properties, Inc., alleges in its petition that these sections of the General Code of this State are invalid and unconstitutional and that their littoral rights are unaffected thereby. It is further averred that all of the filling into the waters of Lake Erie in front of the property of the plaintiff was for the purpose of wharfing out to navigable waters in aid of navigation and commerce. It is alleged that the road which has been constructed by the City of Cleveland was built for the purpose of facilitating and expediting passenger automobile traffic from the downtown portions of the city to the easterly portion thereof, and that the road as constructed interrupts and cuts off the owners of the upland from the navigable waters of the Lake.

"The prayer of the petition is for a declaratory judgment determining whether the plaintiff is entitled to the exclusive use of the made land in front of the upland for the purpose of a wharf in aid of navigation and whether a right exists and is appurtenant to said upland for the sole and exclusive use of the owner to fill into the non-navigable waters for the purpose of wharfing out to navigable waters in aid of navigation

and commerce. The Court is further asked to determine whether §§3699a, 3699-1 to 3699-10 GC are constitutional enactments.

"In the answer and cross-petition of the City of Cleveland the City admits the corporate capacity of the plaintiff and the defendant, the Union Salt Company, admits the acquisition of the title to the property described therein by the plaintiff and alleges that the outer harbor of the City of .Cleveland is an artificial one formed by a breakwater built for a distance of about five miles easterly and westerly along the Lake Front, at a variable distance from twenty-five hundred feet to four thousand feet out from the natural shore line; that from East 9th Street to Gordon Park this breakwater is about three miles in length; that the breakwater was started about the year 1875 and was completed in the year 1915, that up to the time of the filing of this case the only developed docks were a pier built by the United States government at the mouth of the Cuyahoga River, two docks and slips built by the Pennsylvania Railroad near the foot of West 9th Street, a lumber dock at the foot of East 40th Street and an unloading dock and plant of the Pennsylvania Railroad Company at the westerly end of the harbor, the piers of the Detroit & Cleveland Navigation Company, and the Buffalo Transit Company, at the foot of East 9th Street. In 1929 the Universal Terminals Company built a modern dock and terminal near the foot of East 53rd Street.

"The answer further alleges that 'such dock development put to use for navigation purposes less than one mile of the five miles of harbor frontage protected by said breakwater, previous to the building of the Cleveland shoreway.' The answer of the City of Cleveland further avers that for many years the City has been planning for increasing the water commerce of the port of Cleveland and has developed plans for docks, railways and street purposes to the water front in order to take advantage of the business that may arise out of the completion of the St. Lawrence Waterway's opening the Great Lakes to overseas commerce. The City further avers that any filling in which has been done in front of the property of the plaintiff has been done subject to the laws of the State of Ohio and the regulations of the Federal government. The City admits the filling in in front of the plaintiff's property but the City denies that the filling was for the purpose of wharfing out but rather for the purpose of making land to be added to its upland rather than for the purposes of navigation. The City's answer then refers to the ordinance passed

by the City Council providing for the construction of the street over the submerged or filled lands, and refers to said ordinance designating that the street was to provide direct access to all piers, docks and wharves; that it was constructed during the years 1936 and 1937; that no portion of said road was placed on or over any area filled in by plaintiff or its predecessor in title. In brief, the answer of the City of Cleveland alleges that said road was built for the purpose of providing a marginal roadway as an aid to navigation servicing docks, wharves and piers that might subsequently be built on the Lake Front.

"In its cross-petition the City of Cleveland alleges that the title to the whole area of Cleveland harbor, filled and submerged, northerly of the last natural shore line of the Lake and between it and the harbor line is in the State of Ohio, held in trust for public uses and that the City plans eventually to take possession of said filled area for public use in aid of navigation.

"The City in the prayer of its petition joins with the plaintiff in requesting the Court for a declaratory judgment to determine the relative rights of the parties.

"The Union Salt Company in its answer admits that the City of Cleveland has constructed in front of its property the roadway which the defendant the Union Salt Company claims is not an aid of navigation but is a high speed automobile roadway for passenger vehicular traffic.

"In its cross-petition the Union Salt Company sets forth its ownership of the property described therein and which fronts on Lake Erie, alleges that its access to navigable waters as a littoral owner has been impaired and destroyed by the roadway constructed by the City. The Union Salt Company alleges that as a littoral owner its right of access to navigable waters is a property right of which it has been deprived, and for which it is entitled to compensation. The Union Salt Company requests the Court to determine its rights.

"Replies have been filed, by the respective parties, to the pleadings heretofore referred to. These replies are in the nature of general denials."

Before reviewing the evidence relevant to the issues thus presented, one factual issue may be disposed of, and such disposition will have a definite bearing upon all the issues involved.

The City of Cleveland claims the roadways involved are

employed in aid of navigation. The City ordinances, adopted in 1935 and 1939, authorizing the ·construction so required. The following excerpts therefrom so indicate:

"Section 1. That this Council hereby declares its intention to open a street from East 9th Street to East 70th Street thereby making direct access to all piers, docks and wharves now or hereafter constructed on the Lake Front, and to establish the lines of said street and a width of 230 feet between East 9th Street and East 70th Street, the northerly line thereof being 150 feet northerly on the southerly line and 80 feet southerly by rectangular or radial measurement from the following described main base line."

"The title to filled land on which said street is to be constructed is in the State of Ohio, the use and development of which in aid of navigation is, by statute, given to the City of Cleveland.

"So much of the land, if any, within said roadway, as lies southerly of the natural ·shore line shall be acquired from the owners thereof by appropriation or otherwise."

"Section 2. That the Mayor be and he is hereby authorized to cooperate with the Federal government in arranging for the construction of said roadway or street, it being understood and agreed that said work shall be done without in any way impairing or otherwise affecting the right, title and interest of the owners of the land forming the natural shore line of Lake Erie between the points aforesaid, and that the owners of the land abutting on the proposed roadway shall have the right, at their own expense, to cross said highway either above or below the grade as they may elect, provided such overhead structures shall be of height sufficient to allow ordinary street traffic to pass· freely thereunder and any underground structures shall be built so as not to in any way injure, weaken or impair said roadway."

It is the claim of the appellee that the roadways not only are not employed in aid of navigation, but definitely confiscate the right of access of the littoral owners to navigable waters and are, as employed, entirely useless as any aid to navigation.

It is the opinion of this Court that the evidence does not justify the conclusion that such roadways are inherently as static constructions violative of the rights of the public of the state in the area formerly occupied by the waters of Lake Erie and now constituting fills in such area.

The evidence does conclusively show that as such roadways are now employed, regulated, and operated, they have little, if any, value to the public of the State of Ohio for uses in aid of navigation, but, on the contrary, are employed as high speed boulevards permitting rapid transit to and from the congested area of the City of Cleveland.

(2) Further, that such roadways, under proper regulation, consistent with the rights of the public of the State of Ohio as beneficiaries of the trust under which the State holds title to the area so filled, could and should be employed for uses in aid of navigation and still permit a reasonable use by the public for other lawful purposes.

It is common practice, especially within city limits to require "slow moving vehicles" to use the exterior lanes of a highway, permitting more rapid transit on the center lanes. It is also a matter of common knowledge that trucks and trailer trucks consisting of multiple units travel at speeds reaching, if not surpassing, the maximum reasonable speed limits fixed by the State. It is also true that in many sea ports marginal highways are constructed, with two levels, the lower devoted to slower and heavier traffic, the upper constituting express highways for passenger and lighter vehicles.

It would also seem clear from the evidence that access of littoral owners to harbor facilities could be accomplished without detriment to any of such uses of such roadways.

It appears from the evidence that during twelve daylight hours on an average of twenty to thirty thousand vehicles pass over these roadways, 10% of which are of the heavy truck type.

In the brief of appellant, it is stated:

"The witnesses for all the parties testified that just such a street as the Shoreway on the low level behind the existing or potential wharf strip was a proper and necessary means of access to the existing and future docks; that such a street was necessary for the coordination of the existing or needed port facilities or those expected to be needed; that for nearly fifty years all the city planning had included just such a street; that the municipal ordinances authorizing its construction, in Section 1 (Ordinance No. 103455, Exhibit T, p. 2038) declared "its intention to open a street from E. 9th Street to E. 72nd Street, thereby making direct access to all piers, docks and wharves now or hereafter constructed on the lake front'; all such facts plus the court's judicial notice of the physical, historical and economic facts that have a bearing stamp the street as a harbor improvement in the public interest in aid

of navigation and the other public uses to which the area is adapted."

It is also true that many of the commercial wharfs and docks are located at the western end of the area involved.

The question then presented is, evidently even from the appellant's standpoint, not whether the roadways **could** be used for purposes in aid of navigation, but whether they **are** so employed.

The trial court found that in constructing said highway, and for the purpose of such construction, the City removed earth which had been deposited as fill upon plaintiff's made land in the amount of 124,757 cubic yards; that all such construction was done in connection with and as a part of such highway project, and that all such works are not works in aid of navigation and commerce, and were constructed without plaintiff's permission or consent, with no appropriation or other acquisition of the right therefor, and without compensating plaintiff in any amount whatsoever; and that such works impair, impede and interfere with plaintiff's access to said upland, and its wharf lying southerly of such works, to plaintiff's made land lying northerly thereof, and to the waters beyond; that such works deprive plaintiff of the use for navigation purposes of the made land thereby occupied, and that the acts of the defendant in constructing and maintaining said works without having acquired from the owner the right to do so, were and are unlawful, but that said highway is being extensively used by the public, and if its maintenance and use be enjoined, great public inconvenience would result.

The Court, in lieu of injunction, awarded plaintiff the right to damages against the City for the impairment and impediment of and interference with its said access, and for the deprivation of its wharf by the occupation thereof by such highway 230 feet in width, and for the taking away of the 124,757 cubic yards of earth, which damages included compensation for the permanent maintenance and use by the City and for deprivation of use since the works were constructed, and directed that a jury be empanelled to assess the amount of such damages, and held that such assessment should include damages to plaintiff for interference with plaintiff's facility to take and discharge water of the Lake to and from its upland, but plaintiff was given the right to construct conduits under the roadway reasonably suitable for such taking and discharge, and plaintiff was held to retain all its rights in made land then or in future existing, and the submerged land in front of its upland, except the part occupied by the high-

way, as if the same had not been installed, including the right of ingress to and egress from lands on either side of the highway as if plaintiff were the abutting owner thereof, and plaintiff was further awarded the use of land occupied by the sewer extension not within the roadway, subject to the right of the City to maintain said sewer. Plaintiff also was awarded the right to erect, at its own cost and expense, a structure either above or below grade, for crossing said roadway, which may have been of permanent character and without hazard to passage along said highway. All costs were to be taxed against the City of Cleveland.

Certainly, it is possible to enjoin an improper use of a highway, without destroying its existence as such. It seems clear that such a result, controlling the highway, so that it may conform to lawful use is perfectly consistent with the jurisdiction of the court, sitting as a chancellor, and that a decree to this effect would not unduly burden the court with unwarranted supervision. This would simply be carrying out the expressed purpose contained in the ordinances of the City providing for the construction of the roadways in question and the purposes for which the appellant admits such roadways should be used, and, in fact, claims are used.

The question of whether such regulation may be lawfully enforced as against the appellant involves the question of the rights of the City in the filled in area under statutes of Ohio and the decisions of the Supreme Court of this State.

The principal questions thus involving access and use of the highways are both affected by the conclusions of the court upon the validity of certain ordinances and legislation, particularly applicable to the rights involved.

Incidentally, except for the opinions of a number of witnesses, the evidence in this case is not in serious conflict as to the essential issues, for the reason that it deals with the physical characteristics of the lake front and shores, of which, the court probably, even in the absence of evidence, could take judicial notice, and certain historical facts which are matters of record.

As counsel for appellant state in their brief:—"The 'disputed facts' therefore are differences as to ultimate conclusions of fact or law from admitted evidential facts."

A review of the authorities dealing with the issues here presented develops the existence of a conflict of interest between littoral owners and the public of the State as a whole.

The littoral owners assert an absolute right of access to the navigable waters of the lake, which they claim cannot be impaired without compensation. The City as a delegated agent of the State claims the right to construct and maintain a marginal highway over ground filled in beyond the natural shore line, being the area held by the State in trust for public use, such highway to be used for purposes in aid of navigation and fisheries. As hereinbefore indicated, use of such highway for purposes excluding such public use cannot be sustained. If it could only be used for purposes exclusive of purposes which would inure to the benefit of the people of the State as a whole, regardless of the investment therein, it would have to be eliminated. It will, therefore, be considered that such highway is to be used (as it must be) for purposes consistent with the rights of the people of the State to have it used for purposes serving them.

The conflict of these antagonistic rights will now be considered in view of the decisions of our Supreme Court and legislation relevant to these rights.

The City predicates its claim to maintain the highways without compensation to littoral owners in the alternative (1) upon the common law; (2) the so-called Fleming Act (Secs. 3699a-3699-1 to 3699-9, GC).

(3) With all due regard to the industry and ability shown by the City in attempting to establish its rights under the Common Law, exclusive of the Fleming Act, it seems clear that the case of **State of Ohio v Cleveland & Pittsburgh Rd. Co., et al., 94 Oh St 61,** is dispositive of such position adversely to the contentions of the City.

As the case has a critical bearing upon almost all the issues involved it will be given careful consideration.

The original action in Cleveland & Pittsburgh Railroad case was filed in the Court of Common Pleas of Cuyahoga County by the State of Ohio and was brought against several railroads to enjoin filling upon subaqueous land in front of their property on Lake Erie, and to require the defendants to restore the waters to their original condition.

The railroads defended their right to fill in upon the basis that such action was in conformity to their rights as littoral owners to wharf out to navigable waters and that such fills were made in the process of exercising such rights.

The state stood squarely upon the basis that the submerged territory in front of defendant's lands is owned by the State of Ohio as proprietor thereof, and that the action of defendants in filling out was an invasion of the proprietary

interest of the State. The contention of the state is set out in the opinion of the court at page 68:

"The contention of the plaintiff is that the state is the absolute owner of the subaqueous land between the shore and the harbor line, and that the littoral owner has no right to wharf out, either by filling in or otherwise, to reach navigable water. It is contended that this is the rule fixed by the English common law, which it is claimed prevails in Ohio."

Immediately following this statement, the Court sets out the adverse contention of the defendants:

"The defendants concede that the title to the submerged land is in the state, not as absolute proprietor but as trustee for the public in the protection of navigation and fisheries, subject to the paramount right of the federal government in the regulation of navigation.

"They claim that incident to the ownership of the upland the littoral owner has a right to wharf out to navigable water, and that this is a property right which cannot be taken from him under the constitution without compensation. They insist that where the United States government establishes a harbor line it fixes at that point navigable water, and the right exists in the owner of the foreshore to wharf out, by filling in or otherwise, over the shallow waters between the shore and the harbor line in order to reach the point of navigability thus established."

Thus, the question of whether the right of littoral owners is controlled by the common law as recognized in British Courts is made a definite issue of law in the Cleveland & Pittsburgh Railroad Company case.

At page 70 of the opinion it is stated:

"It has been repeatedly determined by the courts of this state that they will adopt the principles of the common law as the rules of decision so far only as those principles are adapted to our circumstances, state of society, and form of government. Lessee of Lindsley v Coats, 1 Ohio, 243.

* * * * * *

"The strict rule of the common law of England which deprived the littoral and riparian owner of the right to wharf out and which originated in the time of the Stuarts has been much relaxed in Great Britain."

And, at pages 77 and 78, the conclusion of the Court as to the then status of the law is stated:

"After a careful examination we are convinced that in most of the states of the United States the conclusion has been arrived at, either by judicial reasoning or by statutory provision which has been upheld, that, subject to regulation and control by the federal and state governments, the littoral owner has the right to wharf out to navigable waters, provided he does not interfere with the public rights of navigation or fishery, and that the state holds the title to the subaqueous land of navigable waters as the trustee for the protection of the public rights therein. Piers and wharves are a necessary aid to navigation, as much so as the harbor itself, and the right to construct them is as important and essential. Without them the operations of commerce would be seriously weakened. If they are to be useful these piers must extend into water of sufficient depth to float loaded vessels. The littoral owner has an undoubted right of access to the water, and if this right is to be of value it must be such access as will enable him to reach navigable water and to do the things necessary to that end. Courts in ascertaining and declaring these rights must regard the object for which they are conferred. In this case that object is to aid the commerce of the lake and develop the business of the country."

So regardless of what may have been stated by the Supreme Court in previous decisions, these quotations from the Cleveland and Pittsburgh Railroad Company case indicate the conclusion of the court upon the application of the rigid common law rule, and they are carried into the syllabus:—

"1. Under the constitutional grant of authority to regulate interstate and foreign commerce, the United States government has paramount control of navigable waters and power to establish therein harbor lines and regulations.

"2. The title and rights of littoral and riparian proprietors in the subaqueous soils of navigable waters, within the limits of a state, are governed by the law of the state, subject to the superior authority of the federal government.

"3. The title of the land under the waters of Lake Erie within the limits of the State of Ohio, is in the state as trustee for the benefit of the people, for the public uses to which it may be adapted.

"4. The state has control of a harbor within a harbor

line and may enact legislation prescribing regulations in connection therewith and to secure the rights of the public, provided it does not conflict with the regulations of the federal government.

"5. The littoral owner is entitled to access to navigable water on the front of which his land lies, and, subject to regulation and control by the federal and state governments, has, for purposes of navigation, the right to wharf out to navigable water.

"6. The ownership of the waters of Lake Erie and of the land under them within the state is a matter of public concern. The trust with which they are held is governmental, and the state, as trustee for the people, cannot by acquiescence or otherwise abandon the trust property or permit a diversion of it to private uses different from the object for which the trust was created. The littoral owner is charged with knowledge that nothing can be done by him that will destroy the rights of the public in the trust estate."

The injunction and prayer for restoration were refused. On pages 79 and 80 of the opinion, however, it is stated: (4)

"Until the enactment of appropriate legislation the littoral owner, for the purposes of navigation, should be held to have the right to wharf out to the line of navigability, as fixed by the general government, provided he does not interfere with public rights. Otherwise, through the mere absence of legislation by the state, the supreme utility and value of navigable waters—navigation and commerce—would be defeated. Whatever he does in that behalf is done with knowledge on his part that the title to the subaqueous soil is held by the state as trustee for the public, and that nothing can be done by him that will destroy or weaken the rights of the beneficiaries of the trust estate. His right must yield to the paramount right of the state as such trustee to enact regulatory legislation. It must be remembered that his right, pending appropriate legislation, is one that can be exercised only in aid of navigation and commerce, and for no other purpose. What he does is, therefore, in furtherance of the object of the trust and is permitted solely on that account.

"The state as trustee for the public cannot by acquiescence abandon the trust property or enable a diversion of it to private ends different from the object for which the trust was created."

Again, the opinion, page 84, concludes with this statement:

"It is to be presumed that the legislature, in the enactment of legislation on the subject, will appropriately provide for the performance by the state of its duty as trustee for the purposes stated; that it will determine and define what constitutes an interference with public rights and that it will likewise, in a spirit of justice and equity, provide for the protection and exercise of the rights of the shore owners."

The alternative position of the City in the instant case, as stated before is—that if the common law rule is not in force (the Cleveland & Pittsburgh Railroad Company case being severely criticized by counsel for the City) then its rights and claims are sustained by §§3699a, 3699-1 to 3699-9, GC, commonly known as the Fleming Act.

The position of the appellees is, that this act is ineffectual to sustain the claims of the City, because it is unconstitutional in toto, and such was the conclusion of the trial court. This result is reached because of one section included in the act, which is admittedly unconstitutional by all parties. This is §3699-8, GC.

Sec. 3699a, GC, provides:

"It is hereby declared that the waters of Lake Erie within the boundaries of the state together with the soil beneath and their contents do now and have always, since the organization of the state of Ohio, belonged to the state of Ohio as proprietor in trust for the people of the state of Ohio, subject to the powers of the United States government, the public rights of navigation and fishery and further subject only to the right of littoral owners while said waters remain in their natural state to make reasonable use of the waters in front of or flowing past their lands, and the rights and liabilities of littoral owners while said waters remain in their natural state of accretion, erosion and avulsion. Any artificial encroachments by public or private littoral owners, whether in the form of wharves, piers, fills or otherwise beyond the natural shore line of said waters not expressly authorized by the general assembly, acting within its powers, shall not be considered as having prejudiced the rights of the public in such domain. Nothing herein contained shall be held to limit the right of the state to control; improve or place aids to navigation in the other

navigable waters of the state or the territory formerly covered thereby.".

(5) This section states the rights of littoral owners in the subaqueous land and fills thereon. It does not recognize the right of the state as fully as it is proclaimed by the common law in its earlier form.

Sec. 3699-1, GC, provides:

"All municipal corporations within the corporate limits of which there is or may hereafter be included part of the shore of the waters of Lake Erie shall have the power, in aid of navigation and water commerce, to construct, maintain, use and operate or lease the right to construct, maintain, use and operate, piers, docks, wharves and connecting ways, places, tracks and other water terminal improvements with buildings and appurtenances necessary or incidental to such use, on any land belonging to the corporation held under title permitting such use and also over and on any submerged or artificially filled land or lands made by accretion resulting from artificial encroachments, title to which is in the state of Ohio, within the territory covered or formerly covered by the waters of Lake Erie in front of littoral land within the limits of said corporation whether said littoral land is privately owned or not. Any such municipal corporation shall also have power and authority to by ordinance subject to superior federal legislation, establish harbor lines and other regulations for said territory and to prohibit the placing, maintaining or causing or permitting to be placed therein any unlawful encroachments on said territory. The territory to which the powers hereby granted shall apply shall be limited to that within the existing or future corporate limits of the corporation and extending into Lake Erie to the distance of two miles from the natural shore line; and for all purposes of government and exercise of said powers the corporate limits of any such corporation shall be held to extend out, in, over and under said water and land made or that may be made within said territory. These provisions, however, shall not have the effect of limiting the now existing boundaries of any municipal corporation and in case where two municipal corporations have upland territory fronting on said waters and there should be a conflict on account of the curve of the shore line or otherwise as to said two mile boundary the boundaries of each corporation shall be a line midway between the shore-line of each and not exceeding two miles from the shore line of either. Provided, however,

that all powers hereby granted shall be exercised subject to the powers of the United States government and the public rights of navigation and fishery in any such territory and all mineral rights or other natural resources existing in the soil or waters in said territory, whether now covered by water or not, are reserved to the state of Ohio and its citizens."

(6) This section gives the City of Cleveland full power, as an agency of the State, to construct the highways here involved, providing they are operated and regulated as "connecting ways" "in aid of navigation and water commerce."

**Sec. 3699-2, GC,** provides:

"When any part of the territory mentioned in §3699-1 GC, title to which is in the state of Ohio, is in front of privately owned upland and has been filled in or improved by said private upland owner or his predecessor in title to said upland, then a municipal corporation shall not have the power to take possession of or lease such part of the public domain so filled or improved, without the consent of said upland owner, until said municipal corporation has complied with the laws governing the appropriation of private property for municipal purposes, except that in any such proceeding to appropriate there shall be no compensation allowed to the upland owner for the site of such fill or improvements."

(7) This section provides for compensation to littoral owners where fills over subaqueous land or improvements have been appropriated by the municipal corporation. It will be noted that this section of the statute refers to land which "has been filled in or improved by said **private upland owner or his predecessor in title.**"

There is quite a conflict in the positions of the parties as to whether the words "has been"' applies to fills before the enactment of this legislation or merely before the appropriation of the fills or improvement.

It might be unnecessary to determine this issue (although no hesitation is present in holding the words apply to the time when the statute was effective) since the evidence is conclusive that the filling by the littoral owners or their predecessors in title was inconsiderable. Such small amount of fills can be ignored, just as such fills were ignored under the doctrine of "de minimis non curat lex" in considering fills as against accretion in **State, ex rel. v Lakefront East Fifty-Fifth Street**

Corp., 137 Oh St 8, 12. (This matter is considered in more detail hereinafter.)

Sections 3599-3-4, GC, deal with the right of a municipal corporation to lease areas described in §3699-1, GC.

Sec. 3699-5, GC, provides for the administration of these areas.

Sec. 3699-6, GC, provides for the disposition of rental charges, in that the same shall be aliquoted to the improvement of navigation and water commerce.

Sec. 3699-7, GC, provides that the act shall not have a retroactive effect.

Sec. 3699-8, GC, provides:

"All right, title and interest of the state of Ohio in and to all submerged and filled lands in the harbor of the city of Cleveland, described in section 3, section 4, section 5, section 7 and section 9 in an ordinance of the city of Cleveland, designated Ordinance No. 37904-A, passed September 13th, 1915, which authorized the mayor of the city of Cleveland to enter into a contract with certain railroad companies for the purpose of securing a union passenger station for the city of Cleveland, together with all other submerged and filled lands within a tract which is bounded westerly by the east bank of Cuyahoga river as it now runs and the east government pier, northerly by the government harbor line as it is now or may hereafter be established, and easterly by a line extended northerly and at right angles or normal to the natural shore line of Lake Erie from a point, on said natural shore line, one hundred and fifty (150) feet easterly from the easterly line of East 26th Street or said easterly line produced northerly, is excepted from the provisions of §§3699-1 to 3699-7, GC, inclusive of this act. Nothing herein shall prevent the general assembly from conveying the right, title and interest of the state in any lands described in any agreement now made between a municipality and any railroad company or companies for the purpose of securing railroad terminals and stations, and which land may be a part of the lands described in section one hereof; in any such event the conveyance shall be made in conformity with the provisions of such agreement."

Sec. 3699-9, GC, provides:

"Should any of §§3699-1 to 3699-8, GC, inclusive, or any provision of said sections be decided by the courts to be unconstitutional or invalid the same shall not affect the validity

of said sections as a whole or any part thereof other than the part so decided to be unconstitutional or invalid."

(8) It is admitted by all parties that §3699-8, GC, is unconstitutional and void, as violative of more than one section of the Constitution of Ohio. It is certainly directly contrary to the inhibition expressed in the Cleveland and Pittsburgh Railroad case, at page 80 of the opinion, where it is stated:

"The state as trustee for the public cannot by acquiescence abandon the trust property or enable a diversion of it to private ends different from the object for which the trust was created."

The same limitation appears in the 6th paragraph of the syllabus, hereinbefore set forth. The trial court found this section unconstitutional.

The difficulty in connection with this legislation arises in the adverse contentions of the parties as to the effect of this unconstitutional section upon the other sections of the act. It is the contention of the appellees that this section incorporated the whole purpose of the entire act, and, hence, permeated all the sections of the act with the vice of unconstitutionality.

On the other hand, it is the contention of the City that §3699-8, GC, is entirely severable from the other associated sections, and is saved by §3699-9, GC.

The position of the appellees is predicated to large extent upon certain extraneous matters which it is claimed were responsible for the enactment of the entire act.

The so-called Fleming Act was enacted in 1917, (107 Ohio Laws p. 587) and was supplemented in 1925 by the so-called Abele Act (Sec. 3699-10, GC, 111 Ohio Laws, p. 417). The Cleveland and Pittsburgh Railroad Company case was announced February 29th, 1916.

For some years prior to 1915 there had been some activity in the City of Cleveland looking toward Lake Shore planning. Especially, in 1914, a special committee of the Council of the City of Cleveland was appointed to consider Lake Front planning. The report of this committee involved consideration of a plan including public control of the harbor as a whole, the need of a belt line railway and street access along the water front, and opposition to any extension of control by littoral owners into the harbor areas.

On July 12, 1915 the City Council of Cleveland adopted the

so-called Barber Franchise ordinance (which was never accepted or exercised) for the development of a railroad subway approaching the lake front from the south under East 55th Street and granting a permit for the development of the lake frontage east and west of East 55th Street.

By Ordinance No. 37904-A, passed in 1915, while the litigation between the State and the railroads was progressing that culminated in the decision in **State v C. & P. R. R., 94 Ohio St 61,** the City of Cleveland adopted the so-called Union Depot Ordinance of that date which provided for a union depot at the head of the Mall between East 9th Street and West 3rd Street. This is the ordinance mentioned in §3699-8 GC and is the agreement that the City contends never had any validity and the matter is now in litigation between the City and the railroads. The alleged contract made under said ordinance was never executed, the lake front depot was abandoned but the lake front land trades and the release of the public rights therein provided for were attempted to be preserved in the latter ordinances providing for a union depot on the square.

In 1918 the City, being desirous of extending to the west its light plant lake frontage upland near East 40th Street, found that The Cleveland Builders' Supply Company held title to lake frontage next west. Also it was found that the City then owned frontage still further to the west just east of East 40th Street. A trade was made between the City and the said Supply Company by which the Supply Company deeded its frontage to the City and the City deeded to the Supply Company the frontage owned by it near East 40th Street. In such last mentioned deed the City reserved a right of way 150 feet wide east to west across the submerged and filled area in front of the upland it deeded.

In 1920 the City adopted a plan for the development of the whole area of the east basin of the harbor. This plan called for a roadway 150 feet wide from East 9th Street to East 67th Street on the low level.

On December 3, 1928, the so-called Hopkins Plan was presented to the Council, Ordinance No. 85781. This plan was never adopted by the Council but the map shows that it included a waterside street and marginal railroad strip 230 feet wide substantially at the same location as the road in question in this case, built by the City in 1935 to 1937.

On December 3, 1928, being the same day on which the so-called Hopkins Plan was presented to the Council for consideration, Ordinance No. 85532 was introduced and passed as an emergency measure granting a permit to the Universal

Terminals Company to fill in in front of certain upland owned by it and to build a wharf and start building thereon out to and southerly of the bulkhead line. The Universal Terminal Company, pursuant to said permit, made the fill contemplated and built the dock properties that now exist in front of their upland. The effect of such councilmanic legislation, the construction thereof and its validity is a matter of litigation now between the City and such permittee.

In 1931 the City of Cleveland adopted a new charter, abandoning the City Manager plan and going back to the Mayor plan. Section 45 of this charter reads as follows:

"Neither the council, nor any board, commission or officer of the city of Cleveland, shall have power, or shall assume, to act for the city to authorize, consent to, or procure the alienation, surrender or release of any rights of the city of Cleveland, the state of Ohio, or the people, in or to the territory now covered by the waters of Lake Erie within or immediately contiguous to the territorial limits of the city of Cleveland, or formerly covered thereby but now filled as the result of artificial causes; except that the council may, by resolution or ordinance adopted or passed by a vote of not less than two-thirds of its members, authorize or consent to the alienation, surrender or release of such public rights in so much of said territory on the shore side of any right of way for street or marginal railroad purposes, the northerly line of which right of way shall be not less than 1,000 feet southerly from such harbor line as may be established in front thereof. Provided, however, that the provisions of this section shall not prevent the granting of leases or franchises in or to said territory or any part thereof for periods of not to exceed thirty-five years."

Now it is the contention of the appellees (and the trial court so found) that the whole of the Fleming Act was in effect nothing but a vehicle through which the 1915 ordinance of the City of Cleveland, providing for a contract with the railroads, in which a site for a union passenger depot could be acquired, in the trust area of the state, could be made a lawful exercise of municipal power, by a grant to the City of title in such area.

Reference again to the Cleveland & Pittsburgh Railroad case shows that the Supreme Court had definitely stated that such action by the legislature as is found in §3699-8, GC, was

entirely beyond its power and void as a violation of the duties and obligations of the trust under which the state held title to the areas for the benefit of the people of Ohio for public purposes, including navigation, commerce, and fisheries.

Undoubtedly, there were those representing the City at that time who urged the incorporation of §3699-8, GC, in the act. But this act covers much more than this particular section. It supplies the defects in legislation pointed out in the Cleveland & Pittsburgh Railroad case, and, undoubtedly, the framers of the act must have entertained some doubt as to the validity of this section, hence, the incorporation of §3699-9, GC, and, therefore, it was the purpose of the legislature to preserve the rest of the act.

The appellees rely strongly upon the case of **State, ex rel. v Buckley, et al., 60 Oh St 273,** as sustaining their contention that the whole Fleming Act must fall because of the one unconstitutional section.

The first and second paragraphs of the syllabus in State, ex rel. v Buckley, are:

"1. When an act of the general assembly, required to have uniform operation throughout the state, expressly excepts from its operation one or more cities or counties, such act by reason of such exception is unconstitutional and void.

"2. Such an exception can not be held invalid and thereby extend the act over the excepted territory, because in such a case the general assembly never enacted the statute in such territory, and the court has no power to enact it therein."

It is recognized that the syllabus states the law of a Supreme Court decision, but such syllabus is framed by the facts considered by the court. **Williamson Heater Co. v Radich, et al., 128 Oh St 124.**

The facts upon which the case of State, ex rel. v Buckley is predicated vary materially from those herein involved. On page 295 of the opinion the section of the statutes there under consideration was quoted in part:

"**Section 2926b,** as amended April 16, 1896, 92 O. L., 166, provides among other matters as follows: 'In all such cities of the first and second class, except Mansfield and cities of the fourth grade in the first class, a 'board of elections,' to consist of four electors of such city, of well known intelligence and integrity, two of whom shall belong to each of the two

leading political parties, shall be appointed by the mayor.' As this law excepts the city of Mansfield and the cities of the fourth grade in the first class from its operation, it is not of uniform operation throughout the state, and therefore is in conflict with **Section 26 of Article 2 of the Constitution,** the subject of elections being one of a general nature."

Now it is apparent that the city of Mansfield was never included in the provisions enacted.

It is manifest that the act (2926b) as passed did limit its entire application to area **excluding** the city of Mansfield. On page 296 of the opinion, it is stated:

"It is urged, however, that if this exception makes the act unconstitutional, the exception should be disregarded, and the act held valid as operating uniformly throughout the state. The answer to this is that the court has no law-making power, and cannot extend a statute over territory from which it is excluded by the general assembly. A court can hold a whole act unconstitutional because it is not broad enough, that is, because it is not of uniform operation throughout the state; but it cannot extend an act which is too narrow, so as to take in territory which was left out by the general assembly. In the case of an exception, the general assembly never enacted the statute in the excepted territory, and the court has no power to enact it therein.

"(9) There is a difference between an exception and a limitation. When a statute upon a subject of a general nature is made to extend to the whole state in one part thereof, and then in another part an attempt is made to limit its operation to territory less than the state, the limitation may be disregarded; because to give it effect would render the whole statute unconstitutional; and such construction should be given when reasonable, as will uphold the statute rather than one which would defeat it. **Burt v Rattle, 31 Oh St 116.**"

Counsel for appellees ingenuously argue that if §3699-8, GC, is ignored, the Court is in effect extending the other provisions of the act to an area excluded by the legislature and, hence, by judicial legislation its manifest intent is thwarted. But such is not the case. The exact situation described in the second paragraph, just quoted, is found in the Fleming Act. The provisions of "§3699-1 to 3699-7, GC, inclusive," are extended in application to the area described in §3699-8, GC. Although the act uses the term "excepted," nevertheless, the

provisions of §3699-8, GC, constitute merely a "limitation" upon the application of the previous sections.

Again, it does not appear that there was in the case of State, ex rel. v Buckley a saving clause, such as is found in §3699-9, GC. To ignore the saving clause would be just as much judicial legislation as to ignore what really constituted an "exception" if it existed.

It is manifest that the legislature intended to save the "uniform operation" of the general sections if §3699-8, GC, was invalid. It could not have more clearly expressed such intention. It is also to be noted that this latter section, by its terms, has no application to the provisions of §3699a, GC, containing the declaration of rights of the State in the waters of Lake Erie.

Another case cited by the trial court in support of its conclusion, that the vice of §3699-8, GC, permeated the whole act, is **Kelley v State of Ohio, 6 Oh St 269.** In the title of the act there under consideration, jurisdiction of the Common Pleas Court in "certain counties" was provided for, and this was mentioned in the opinion as influencing its determination of total unconstitutionality. (p. 275, opinion.)

In **Gager, etc. v Prout, 48 Oh St 89,** the statute under consideration was held not to have an ex post facto operation. At **page 108** of the opinion it is stated:

"Therefore the question made is fairly presented. But we think it must yield to a rule of construction that has been firmly established by repeated decisions of this court. By this rule a statute may be invalid in part, by reason of some provision being repugnant to the constitution, and valid as to the residue, where it appeals that the invalid part is an independent provision, not in its nature and connection essential to the other parts of the statute, nor so related to the general purpose of the statute as to warrant the conclusion that the legislature would have refused to adopt it with the invalid part stricken out."

It is the contention of appellees that the legislature would not have enacted the Fleming Law without §3699-8, GC. This is based upon extraneous facts from which such inference, or rather speculation, is drawn. There is not only nothing in the act to so indicate, but §3699-9, GC, definitely points to a contrary conclusion. Knowing that the Supreme Court in the

Cleveland & Pittsburgh Railroad case had specifically pointed to the invalidity of provisions, such as were incorporated in §3699-8, GC, can it be supposed that the legislature did not intend to preserve the other sections in the act when it included §3699-9, GC, therein?

(10) It is the intention of the legislature that is involved in construing the law, not the intention or purposes of some portion of the public which might be anxious to see the invalid section enacted.

The trial court's final conclusions were predicated upon the invalidity of the Fleming Act in toto. It then fell back upon the Cleveland & Pittsburgh case as the "guiding star" for its rationale. Judge Corlett stated: "In the absence of valid legislation, this Court finds itself in the same position as did the Supreme Court in deciding the Cleveland & Pittsburgh Railroad case."

Again, on page 70 of Judge Corlett's opinion, it is stated:

"Perhaps our consideration of the relative rights as between the City of Cleveland and the littoral owners would be less confused if we kept in mind that the subaqueous soil on the Lake Front of the City of Cleveland is owned neither by the City nor the littoral owners, but by the State of Ohio, and until appropriate legislation is enacted, whatever structures either the City or the upland owners erect on the State's property remain there at the sufferance of the State and, if not aids to navigation, may be regarded as purprestures and removed by the State without compensation to the owners erecting them."

The opinion of Judge Corlett shows the employment of great industry and ability. It constitutes an exhaustive consideration of the applicable law. It is with the greatest respect for his reasoning and conclusions that a different solution of the problems considered is here reached. The industry and ability of all counsel involved also require full commendation, as well as the thanks of this Court in aiding it in appraising relevant authority and ascertaining the pertinent facts involved and the respect of this Court is also expressed to those of counsel with whom the Court differs.

The Fleming Act was amended by §3699-10, GC, known as the Abele Act. There is an entire unanimity of opinion by all counsel and the trial court in concluding that this act is unconstitutional, containing as it does the vices criticized in the Cleveland & Pittsburgh Railroad case and contained in §3699-8,

GC. In this conclusion, this Court also agrees, but such invalidity in the opinion of this Court has no effect upon the rights now considered, and action by this Court in passing upon its constitutionality would be mere obiter.

Another case requires mention before finally leaving a consideration of the validity of the Fleming Act, and that is the case of **State, ex rel., v Lakefront Co., 137 Oh St 8, supra.** That case dealt with the rights of littoral owners in land created along its lake shore by accretion. The full right and title of such littoral owners in such land was sustained. The constitutionality of the Fleming Act was not raised as an issue by counsel. Except, as previously noted, the applicability of this case to the issues presented is not apparent.

In the Cleveland & Pittsburgh Railroad case, as previously noted, the Supreme Court in the closing paragraph of the opinion stated its belief that the legislature when it came to declare the rights of the state in the waters of Lake Erie would protect the rights of littoral owners. That protection is found in §3699-2, GC. An acute difference of opinion appears here predicated upon the question of whether the act applies to fills upon the lake shore made **after** the passage of the act. It would seem that the legislative intent was to fix the status of littoral owners as to **all** matters considered, as of the effective date of the act, for the law having been then declared and the status fixed, such littoral owners could govern themselves accordingly. Any expenditures or effort by such littoral owners, in extending dominion over the trust area of the state would be accomplished with full knowledge of the superior rights of the state, and that any improvement might be taken **without** compensation. The factual situation also renders it unnecessary to predicate a conclusion entirely upon such holding, for from the evidence it does not appear that any ground in question (except to a negligible extent) "has been filled in or improved by said private upland owner or his predecessor in title." The evidence is that practically all of such fills were made with the **consent** of the owners, but not by them or their predecessors in title, and that at least some of the ground was due to accretion. On this point, the trial court found that:

"Before the road was constructed considerable filling had been made in front of the upland of Union Properties, Inc. This filling was done under permit of the United States government. A considerable amount of this consisted of ashes, rubbish and waste material collected and deposited there by the City of Cleveland on a permit granted by the then owners,

the Wilson Realty Company, predecessor in title of the Union Properties, Inc."

Certainly, it would be very difficult to ascertain what was filled in by littoral owners and what was filled in merely with the consent of same. The evidence as to filling as developed from the record is insufficient to extend the littoral owners relief under the provisions of §3699-2, GC.

## LATERAL LINES.

The trial court was called upon to locate certain lines, fixing the area of littoral rights extending out from the natural shore line. One of such lines had been previously determined in a case heard by the Court of Appeals of the Eighth Judicial District, No. 17,549, and such line was adopted by the trial court; the other line, (the easterly boundary) was determined to be a line extending from the intersection of the easterly upland boundary with the shore line of Lake Erie, at right angles to the break water constructed by the Federal government. Such finding and conclusion is approved, subject, however, to the final conclusions of this Court upon the rights of littoral owners in this area.

Before stating the final conclusion of this Court upon other issues presented, a factual phase of this situation requires consideration.

(11) It is the opinion of this Court that under the statutes and decisions of the Supreme Court of Ohio, and the weight of authority, if it became necessary to entirely appropriate the right of access of littoral owners over the area herein involved, in order to further the interests of the people of the State of Ohio in the use of such area for purposes in aid of navigation and fisheries, such right of access could be entirely confiscated by the State for public purposes, without compensation to such littoral owners.

In the opinion of the Court in the Cleveland & Pittsburgh case, after citing and quoting from many authorities of similar import, it is stated at page 83-84 of the opinion:

"The defendants in error contend that the right of the littoral owner to wharf out is a property right which cannot be taken without compensation under the federal and state constitutions. A similar contention was made in Greenleaf Johnson Lumber Co. v Garrison, 237 U. S., 251, where the wharves had been erected in keeping with federal and state lines. The claim was not sustained. ·The proposition announced was: 'The power of the sovereign State or Nation is

perpetual—not exhausted by one exercise—and all privileges granted in public waters are subject to that power; the exercise of which is not a taking of private property for public use but the lawful exercise of a governmental power for the common good.'

"In Scranton v Wheeler, 179 U. S., 141, it is said, at page 164: 'The riparian owner acquired the right of access to navigability subject to the contingency that such right might become valueless in consequence of the erection under competent authority of structures on the submerged lands in front of his property for the purpose of improving navigation.'

"The authorities show that the right of a riparian or littoral owner is always subject to the paramount authority of the state and federal governments for the ends set forth.

"In this case the defendants aver in their answer that the work complained of was and is for the purpose of enabling them to reach navigation and to perform their duties as common carriers. They insist they have no other object. No other purpose and no other result is allowable. **In the absence of legislation by the state touching the subject and until the enactment of such legislation, this was their right.**" (Emphasis added.)

(12) However, it is recognized that a bona fide use of such areas as are here considered for uses definitely associated with purposes in aid of navigation, commerce, and fisheries is to be encouraged. So it is stated in the opinion of the Supreme Court, at page 74, of the same opinion:

"As said in Atlee v Northwestern Union Packet Co. (21 Wall., 389), wharves and piers are almost as necessary to the successful use of the stream in navigation as the vessels themselves, and are to be considered as an important part of the instrumentalities of this branch of commerce."

The highway and roadway in question could be maintained, operated, and controlled, as hereinbefore indicated, and still permit free use by littoral owners of the area in question for purposes of wharving out to navigable waters. Overpasses and underpasses are entirely feasible, and unless extended installation into the trust areas would interfere with public use thereof, should be permitted. As found by the trial court, such

means of access should be accomplished at the expense of the littoral owners and would be subject at all times to the superior rights of the public in the land over which they were constructed. No permanent right against the trust interest of the State can be acquired. While it is not the function of Court to control the discretion reposed in the State or its lawfully designated agents, the hope and confidence expressed by the Supreme Court, it is believed, will not be misplaced and it is the belief of this Court will result in a mutual accommodation of interests of the public and littoral owners in the trust area.

In assignments of error not herein specifically or inferentially considered, no prejudice to the rights of appellants appears.

It is, therefore, the opinion of this Court that the undisputed evidence and the law requires this Court to render the judgment which the trial court should have rendered, to-wit:

(1) That injunction of the maintenance and operation of the highway, roadway and sewer is denied; and that such highway and roadway shall be so controlled, operated, and regulated as to permit free use by the people of Ohio for all public purposes, including navigation, commerce, and fisheries.

(2) That the littoral owners, appellees, are not entitled to compensation, either for limitation of their access to navigable water or for use of filled in ground, but that such littoral owners, at their own expense, should be permitted to cross, underpass, or overpass such highway and roadway, in so far as the same can be done without interfering with the rights of the people of Ohio in the lawful use thereof.

(3) That the littoral owner, The Lake Erie Salt Company, shall have the right, at its own expense, to take water from and return water to Lake Erie, subject always to the rights of the State of Ohio to interfere with such privilege, when it shall be necessary in furtherance of the use of such areas for public purposes, including commerce, navigation, and fisheries, to limit such use.

(4) That the location of lines in the areas involved are as found and adjudged by the trial court.

(5) That appellees pay the costs of this appeal.

HILDEBRANT, PJ, MATTHEWS and ROSS, JJ, concur in Syllabus, Opinion and Judgment.